## WEBSTER ELECTRIC CO. v. PODLESAK.

(District Court, E. D. Wisconsin.   January 8, 1917.)

**1. PATENTS ⊜215—AGREEMENTS—UNFAIR COMPETITION.**

A contract between a manufacturing company and an inventor in its employ, whereby the company agreed to pay the expenses of an application for a patent upon a device invented by its employé, so as to avail itself of the protection of the patent against competition, or to prevent a competitor from securing a similar patent, is a proper subject of agreement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 328.]

**2. SPECIFIC PERFORMANCE ⊜71—AGREEMENTS—ENFORCEABILITY.**

Where both parties knew that the invention for which patent was applied for had been publicly used more than two years prior to the application, an agreement for assignment of the patent cannot be specifically enforced.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 204.]

**3. SPECIFIC PERFORMANCE ⊜121(1)—EVIDENCE—SUFFICIENCY.**

A decree for specific performance must be based upon evidence clearly disclosing an agreement to transfer.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 387, 388.]

**4. SPECIFIC PERFORMANCE ⊜121(4)—EVIDENCE—SUFFICIENCY.**

In a suit to specifically enforce an alleged agreement for the transfer of a patent when issued, evidence *held* insufficient to establish the agreement asserted.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 391–393.]

In Equity.   Bill by the Webster Electric Company against Emil Podlesak.   Bill dismissed.

Williams, Bradbury & See, of Chicago, Ill., and Quarles, Spence & Quarles, of Milwaukee, Wis., for plaintiff.

Thompson, Myers & Kearney, of Racine, Wis., for defendant.

GEIGER, District Judge.   After hearing the testimony and argument in this case, I give my views in support of a conclusion that an interlocutory decree should be entered, vesting the right to the invention, whose title is the subject of controversy, in a receiver or master with full power to prosecute the pending application for a patent, and to that end annulling the defendant's revocation of the power of attorney which he had previously given to the plaintiff's attorneys.   I stated, then, that the two fundamental things of interest to both parties were whether Podlesak was entitled to a patent, and, secondly, whether the so-called Sumpter application might not be defeated through Podlesak's application.   The possibility was recognized that, if the latter disclosed invention and public use more than two years prior to the date of application, both applications (if identity of invention should be found by the Patent Office) would have to be denied upon interference.   It seemed to me that, in view of the importance of this Podlesak invention as between the plaintiff and its

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

competitor, the Sumpter Electric Company, the existence or non-existence of a right to a patent was a primary consideration, and that the question whether the invention belonged to the plaintiff or to Podlesak was secondary; that this importance was the circumstance that led up to the making of an application for a patent by Podlesak two years or more after he conceived and perfected his device. In other words, at or about the time the Sumpter "plug oscillator" appeared on the market, and was pressed by plaintiff's competitor as a new invention, Podlesak's alleged invention of the same device naturally was recognized by plaintiff as of consequence in respect of the right of the Sumpter Company to have a monopoly and appropriate the whole field, and was, as stated, the matter of primary concern to the plaintiff.

.. Except for certain testimony to which reference will be made, the parties agree that, when the Sumpter oscillator came to plaintiff's attention, the defendant, upon producing his drawings and other evidence in either the Sumpter or his own device, saying that plaintiff company had made and abandoned the manufacture, that it was not worth the expense of a patent, etc.; and while it appears that defendant's diffidence was met, and later overcome, by plaintiff's suggestion that the expense of proceedings to obtain a patent would be borne by it, and not by defendant, the dominant purpose which had developed was not the *acquisition by plaintiff* of the invention, but the initiation of proceedings for a patent upon which an interference might be declared against the competitor Sumpter Company's then pending application to patent (supposedly) the identical invention. In other words, this was not only the then dominant purpose, but was susceptible of accomplishment, regardless of the ultimate ownership of any patent *that might be granted.* It was the plaintiff's aim to avail itself of its servant's alleged invention to meet a competitor who was making inroads upon the market through the exploitation of this same device and upon (supposedly) a claim of patent protection. There is no doubt that both plaintiff and defendant recognized this, and that defendant did make his application for a patent (No. 15,198) obediently to this mutual recognition of the end to be acomplished.

[1, 2] This situation impressed me as disclosing what, for the time being, could well be treated as the dominant equity between the parties. The relation subsisting between plaintiff and defendant was such that the purpose of meeting the competitor, either by procuring the issuance of a patent upon the defendant's device, or by frustrating the issue of a patent to the competitor, was an entirely proper subject of agreement between plaintiff and defendant, and was and is a purpose whose accomplishment in the interest of the plaintiff could well be furthered, especially after it had incurred expenses; and it was believed that that purpose could be furthered through the medium of an interlocutory decree. I still think that such would be the better disposition to make of the case at the present time. I pointed out the possible injustice that might result to the plaintiff, if at this time the issue of specific performance should be resolved against it, because, as I view the situation, there is good ground for contending that, even if the issue be decided against it, the defendant might ultimately be

prohibited from carrying out his contract to assign the invention to the plaintiff's competitor.

A further reason for suggesting an interlocutory decree arises out of the suggestion, contained in the evidence, that the defendant not only perfected his invention, but the plaintiff used it publicly, more than two years prior to the application by defendant for a patent. If this were a conceded fact in the case, specific performance would have to be denied, for the reason that the agreement made between the plaintiff and defendant, if it was made, contemplated the filing of an application for a patent, when both parties recognized that none could be granted, and that circumstance injects an element which alone might invalidate any agreement. It is true that this suggestion in the evidence can be dealt with by treating it as a collateral matter not necessary to the present issue, and one which, in view of the possible claim that the use and sale of the device three years ago was experimental only, can be determined by the Patent Office where it may be directly in issue.

The plaintiff, however, is unwilling to accept the interlocutory decree, and upon the effort to settle such decree asserts that it can be content with nothing short of a decree for specific performance; because the defendant has entered into an agreement with the Sumpter or Splitdorf Company which contains, among other things, an assignment of the invention in question, it would be folly for it, the plaintiff, to protect the application in the Patent Office, with the result that the patent, if issued, might vest in its competitor.

[3, 4] I have therefore concluded to dispose of the issue respecting the plaintiff's right to specific performance. The rule is elementary that a decree for specific performance must be based upon evidence clearly disclosing an agreement to transfer; that such agreement is not made out where the evidence in support of the proposition that an agreement was made, though it may seem credible, worthy of belief, and tends to prove the agreement, is met by denial which, upon the whole evidence may equally well be entertained reasonably and in fair-mindedness. That, in my judgment, is the trouble with the plaintiff's case. The claim that a parol agreement to assign this patent was made is supported by the testimony of three witnesses, each of whom says that the defendant in their presence stated that he would assign the patent to the plaintiff. The defendant denies this, and when we approach the problem of finding support in the whole evidence for the assertions made by plaintiff's witnesses, likewise support for the defendant's denial—in other words, when we seek to test the words of these witnesses in the light of all the surrounding circumstances, and particularly in the light of antecedent probability—it is impossible, in my judgment, to accept the plaintiff's testimony upon any ground which will reasonably and justifiably exclude the defendant's denial. On the contrary, an analysis of the testimony casts the testimony of the plaintiff into greater doubt than can be cast upon the defendant's denial; or, to put it in another way, a reasonable mind can as well accept the defendant's denial as the plaintiff's assertions.

This view of the case is prompted by these considerations arising upon the evidence, to some of which allusion has been made: the

dominant purpose of the plaintiff to meet its competitor, who was exploiting a device claimed to be new. · As above suggested, the purpose was (prior to defendant's discharge) susceptible of accomplishment, if at all, no matter whether defendant's invention was in him or in the plaintiff. When that purpose arose, the relations between plaintiff and defendant were, apparently, harmonious. During more than six years his employment had been fixed by successive contracts, which not only prescribed his term, his duties, but practically, without exception, each contained an express stipulation covering the right or interest, if any, which plaintiff may or might have in inventions made by defendant within the term or terms of such contract. Certain inventions were formally assigned. One of the contracts between the parties was dated August 10, 1909, whereunder, apparently, the plaintiff conceives that it had the right to demand an assignment from the defendant of the invention which he had made late in the year 1911; and the complaint in this case was framed with the double aspect of claiming the invention by virtue of that agreement, as well as under a parcel agreement entered into in March, 1915. At the opening of the present trial, however, counsel for the plaintiff disclaimed any right to prevail upon the contract of August 10, 1909, and sought to sustain its right solely upon an oral agreement made, not in March, 1915, but about February 15th. Its witnesses testify to conversations on February 15th and 18th, wherein the defendant promises to transfer the invention to the plaintiff, and to a demand for such assignment made on May 14, 1915, when defendant was discharged from plaintiff's employ.

Now, it is significant, if plaintiff's theory is to be entertained, that both the parties recognized that defendant's invention in February, 1915, was more than two years old. This latter fact is worthy of serious consideration in determining whether the right to the patent, if it ever existed, had not been lost because of a public sale and use. Nevertheless, at that time no inquiry was made by any one respecting defendant's obligation to assign the invention or any part of it to the plaintiff—I mean, his obligation arising out of the contract then, or in 1911, subsisting between the parties. It is all the more significant, in view of the application for a patent proceeding as it did in March, 1915, without assignment thereof. The matter of assigning it was a formality readily accomplished, as is frequently the case, at the time of making the application by the inventor. If, as is contended, there was, at the time when the application for patent was signed, a subsisting definite understanding that it belonged to the plaintiff, it is difficult to see why the same was not carried out at the time when the formality could not have escaped the attention of the plaintiff.

The allegations of the complaint, in my judgment, throw some light upon the case, and, while they need not lead to a conclusion that the testimony of the plaintiff's witnesses was false, deliberately so, they do show an inconsistency, when taken in connection with affidavits filed in this court, between the testimony given here in open court, and such pleading and affidavits, as may well cast the present contention of plaintiff into serious doubt. Thus the contract of August 10, 1909, above referred to, gave to the plaintiff certain rights in the de-

fendant's inventions which it conceived to be valuable; and, upon the supposition, doubtless, that such contract was in force in 1915, or at the time of making the invention in 1911, the bill alleged that in March, 1915, the plaintiff informed the defendant that the invention in question was valuable, that plaintiff desired to obtain a patent, and defendant promised he would do all things necessary to be done by him in obtaining the same, and that he would assign the entire right, title, and interest to the plaintiff in consideration of the payment of the incident expenses by the latter. The bill was doubtless drawn upon that theory, and when, after the commencement of this suit, the plaintiff made an application for a preliminary injunction, two affidavits, made by plaintiff's vice president and its counsel, respectively, both of whom were witnesses on the trial, are significant, because each of them discloses a purpose of testifying to facts which would bring the case within the theory disclosed by the bill, in so far as it rested upon the contract of 1909; and each affidavit is silent as to any disclosure of fact supporting the making of an independent oral agreement in February, 1915, or at any other time.

It is not reasonable to suppose that these affidavits, made so very soon after the relations between the parties had become seriously strained, could have overlooked the real basis upon which the plaintiff rests its right. This doubt, which is cast upon the plaintiff's testimony, is strengthened by certain other occurrences after the defendant's dismissal from the plaintiff's employ. It appears—in fact, it is not seriously controverted—that on the date of the defendant's discharge the matter of the assignment of this patent was discussed; plaintiff's witnesses contending that the defendant then again acknowledged that he had previously agreed to assign it. This is denied by the defendant. But it does appear, without substantial controversy, that defendant at that time stated that he would like to look up the matter, since there were certain patents which the plaintiff did not wish, and that the invention in question was treated as having been abandoned; that defendant at that time requested a submission of the matter of his obligation to assign the patent to plaintiff's counsel, asking among other things that the latter examine the contract or contracts which had been previously entered into as above stated; that plaintiff's counsel subsequently advised defendant that the latter was not under obligation to assign the invention pursuant to the terms of the one contract which it was considered might cover the situation; that defendant at that time offered to give to plaintiff a limited right in the invention if a patent should issue; and it appears that the counsel for the plaintiff did, as late as June, 1915, prepare a letter which would embody such proposition of the defendant.

This latter testimony furnishes good foundation for questioning the probability of the existence of an oral agreement for an absolute assignment made in February, 1915, concurrently with continued negotiations or proposals for a limited right. It is a fair question to ask the plaintiff to account for its disposition to negotiate or to temporize in the matter at all. The testimony of the plaintiff, taken in connection with the other matters referred to, most strongly suggests that until the defendant, some four months after his discharge, entered into

negotiations with the plaintiff's competitor, there had never been an insistance upon an oral agreement such as is now testified to; and that brings an infirmity into the plaintiff's case which, as above indicated, not only weakens it, but strengthens the defendant's denial. No matter what the defendant may have done in September, after he was discharged; no matter how strong criticism may be levied at him and his conduct in dealing or attempting to deal at that time with plaintiff's competitor, the plaintiff's case respecting transactions alleged to have taken place in February is not thereby made stronger. The fact, if it be a fact, that defendant may purpose to give to the competitor the invention which plaintiff so strongly desires, does not support the claim that the defendant in February, 1915, *had agreed* to give it to the plaintiff. That, after all, is the only question to be determined, and not the equity, or the iniquity of the defendant's subsequent conduct. The latter may lend support to a claim that the defendant, as a matter of morals, should not be permitted to assign the invention to the plaintiff's competitor; but it does not follow that he *agreed* to assign it to the plaintiff. A most careful reading of the testimony does not make out the case as disclosing, clearly, an agreement which in justice must be specifically enforced.

The defendant may take a decree dismissing the bill.